## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-155 (ABJ)** |
| **v.** | : | |
| | : | |
| **JACOB HILES,** | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter, which stems from the breach of the United States Capitol on January 6, 2021. As set forth below, the defendant, Jacob Hiles, has provided meaningful assistance to the United States with respect to two pending felony matters, warranting a probation sentencing recommendation from the government. Accordingly, the government requests that this Court sentence Jacob Hiles to a probationary term of three years, 60 hours of community service, and $500 in restitution.

### I.      Introduction

The defendant, Jacob Hiles, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Jacob Hiles pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, and Demonstrating Inside a Capitol Building. While a misdemeanor, the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and

violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Based on a review of the relevant sentencing factors in this case, the government remains focused on ensuring Hiles understands his contribution to the harrowing events of January 6, 2021 and is deterred from further participation in similar events. At the same time, at the government's request, and as detailed further below, Hiles has provided information of significant value to two felony prosecutions related to the events of January 6, 2021. Moreover, he did so without a formal agreement either requiring or rewarding him for his assistance. In other words, rather than seeking to evade justice, the defendant in this case consistently displayed candor and contrition in his dealings with law enforcement related to this case and assisted in the due administration of justice. Consequently, this case is exceptional among January 6 cases sentenced thus far in meriting a recommendation of probation by the government.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

The government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 24, ¶¶ 1–7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Jacob Hiles' Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Jacob Hiles traveled to Washington, D.C., from his home in Virginia Beach, Virginia to attend the "Stop the Steal" rally. On January 4, 2021, on Facebook, Hiles posted a Google Maps image showing the location of the Democratic National Committee within the

District of Columbia, accompanied by the caption, "For anyone who wants to engage in a 'mostly peaceful' protect on Wednesday, here's a good place to start . . . ." The day of the rally, he posted a selfie-style photograph of himself in a car on Facebook, geotagged to Capitol Hill, accompanied by the caption, "Feelin cute…might start a revolution later, IDK." Hiles brought goggles, which he wore later to protect himself from riot-control spray being deployed by law enforcement against the crowd.

Once in the District of Columbia, Hiles met up with his cousin from Ohio, James Matthew ("Matt") Horning, charged separately in case number 21-CR-275 (ABJ). Hiles and Horning proceeded to the West Lawn of the U.S. Capitol. Videos recorded by the defendant and recovered from a search of his cell phone show that he was present at the very front of the crowd, directly next to the police line guarding the west side of the U.S. Capitol.

Hiles filmed several minutes of the standoff between the police and the crowd, including an early attack on the guardrails keeping the crowd back; as an officer pepper sprays a surging member of the crowd, Hiles remarks, "Oh shit." At one point, Hiles states to the officers, "You guys can't do this forever," before offering one of the officers a mask. In another video, Hiles can be heard coughing as police lose control and the crowd advances. As cries of "fall back" can be heard coming from the terrace above where Hiles is standing, Hiles states, "Hey, they're calling you guys up, they're calling you up."  *See* Exhibit 1 (video recorded by Jacob Hiles).

The below screenshot from one of Hiles' videos clearly demonstrates that he was face to face with officers—one visibly bleeding from his cheek[1]—using riot-control spray, batons, and other crowd control methods to defend the U.S. Capitol from the crowd. Hiles also recorded video

---

[1] The officer visibly bleeding in the screenshot above had been stabbed in the face with a flagpole by a rioter in the same area where Hiles was standing. That assault, which occurred shortly before Hiles' video was recorded, is charged in *United States v. Jeffrey McKellop*, 21-CR-268 (CJN).

of a fellow rioter fighting with officers to gain possession of a guardrail. In sum, while the government has found no evidence that Hiles himself engaged in physical contact with officers, he nevertheless demonstrated an intent to defeat law enforcement efforts to protect the Capitol from him and the rest of the dangerous crowd. *See* Exhibit 2 (video recorded by Jacob Hiles).



A subsequent video recorded by Hiles shows him and Horning atop a scaffolding on the west side of the U.S. Capitol. *See* Exhibit 3, (video recorded by Hiles). Hiles and Horning then proceeded from the scaffolding to the Upper West Terrace, where they entered the Capitol Building itself through the Upper West Terrace Door. That door had been breached first at approximately 2:33 p.m. when rioters already inside the Capitol Building opened the door from the inside. Law enforcement attempted to stop the flow of rioters into the building through the door for several minutes, but at approximately 2:44 p.m., officers appear to retreat as the crowd advances.



At approximately 2:45 p.m., Hiles (circled in red below) and Horning (wearing an orange beanie) descended a set of stairs leading from the scaffolding on the west side of the Capitol complex to the Upper West Terrace of the Capitol Building. A line of law enforcement officers faced them as they approached the Capitol Building, resulting in their movements being captured by body-worn camera as shown in the image below.



Shortly thereafter, Hiles entered the U.S. Capitol through the Upper West Terrace Door, followed by Horning.



From there, Hiles and Horning made their way to the Great Rotunda, where they remained from approximately 2:46 p.m. to 2:48 p.m. They arrived in the area of the Senate Wing Door at approximately 2:50 p.m. and remained for several minutes. During that time, both can be seen on surveillance footage apparently chanting along with the crowd and smoking an unknown substance. On Facebook, Hiles posted a selfie-style video showing him in this location smoking an unknown substance, accompanied by a partially visible caption: "I'm not a smoker AT ALL, but when the cop asks you if you are gonna hit that, I ain't gonna let it g[] . . . ."



At 3:00 p.m., Hiles and Horning walked through the Crypt, and at approximately 3:01 p.m., they exited the Capitol Building through the House Wing Door, having spent around 15 minutes inside.

Hiles has admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Public Facebook Posts*

As noted above, the defendant made a number of posts on Facebook relating to his participation in the riot on January 6, 2021, while it was occurring. After the attack on the U.S. Capitol, Hiles continued to post on his public facing Facebook page about his participation.

On January 6, 2021, Hiles posted to Facebook, "After being tear gassed for an hour, we entered the capitol, thousands of us. The fbi shot and killed a woman in front of us. We followed the trail of her blood out of the building. I'm going home. I watched the American government

attack its own people today." Hiles also posted a video of himself outside the Capitol Building

repeating these claims regarding the shooting and stating that the media was "not giving two shits

about it."

Also on January 6, 2021, in an apparent effort to defend his participation, Hiles posted to

Facebook regarding the events at the U.S. Capitol that day:

> The capitol building was not stormed. After an hour of firing tear gas into the
> crowd, the capitol police officers fired an especially strong tear gas, but none of the
> officers had goggles and or masks. The wind blew a big cloud of white gas right
> back into their faces. They gassed themselves. There were officers puking, crying,
> being carried out. The police had to fall back and retreated and allowed thousands
> of people access to the capitol building. Where I was, we assaulted no one, we
> vandalized nothing, and anything an officer asked me to do, I did promptly. Tens
> of thousands of people were behind me and everyone going towards the building.
> Everyone was moving quickly and I am surprised no one was trampled. I asked a
> police officer how to go into the building and he steered me to an open door. Inside
> the building, the police were respectful and courteous to us and we were respectful
> and courteous to them. I had just been gassed and was coughing. An officer came
> over and asked if I was ok, if I needed medical attention, and offered me a bottled
> water and a rag to help get some of the pepper spray off my skin. A couple guys
> were trying to break stuff and a bunch of guys stopped them and brought the police
> over to them. It was the strangest thing, like the police were just giving us a tour of
> the capital. We walked through the building, touched nothing and several times saw
> police officers arguing amongst themselves about leaving. I politely asked a police
> officer how to leave the building, and the young female officer told me turn down
> a hallway and there would be an exit at the end of the hall. We approached a hall,
> and there were offices with congressmen and womens names on them. The police
> were arguing with themselves and I heard a Male officer say to a female officer. "I
> didnt sign up for this". I looked down and I was standing in blood. As I was walking
> beside the blood trail, I saw a bunch of agents in suits rushing into the building and
> they had a bunch of guys in fatigues with rifles standing in a group beside a metal
> detector by the door talking very sternly to them. I continued walking out of the
> building and as I walked out of the door beside a very fresh, thick blood trail, just
> as a woman was being loaded into an ambulance a couple hundred feet away. A
> group of people were yelling at police there. And one guy said he was with the
> woman and they were doing nothing wrong and one of the fbi agents in fatigues
> shot her in the neck with a rifle. From what I saw, nobody was acting crazy inside
> the capital building, and it was somewhat of a celebratory atmosphere. I cant
> imagine why someone would be shot but it was a terrifying experience and I'm
> sorry to hear that the young lady passed away a little while ago. I wanted to go
> home and was making my way away from the building and there was a sea of
> people. I saw the media all over the place and told them about the woman being

shot and to go report on it. 4 or 5 different media outlets I told about it and only one "journalist" acted like I wasnt bothering them. I made my way through the crowd, jumped on the train, and now I'm in the car on the way home. On interstate 95 I have seen hundreds of first responder vehicles headed towards Washington. Today I watched police officers attack american citizens numerous times. I was threatened by police officers for standing with a camera in my hand. I was gassed for simply being a part of a crowd. I had so much pepper spray on my goggles, several times, that my goggles were blurry and I could not see. I was in the very front row and had hundreds of thousands of people pushing me towards the building. I have on video, thousands of people pushing us into the guardrail at the capitol building. An officer walked up to a little old man beside me and put a fire extinguisher sized bottle of peeper spray in the mans face and told him "you touch that fucking rail one more time and I'm gonna empty this on your nose". I never in my life thought I would see what I saw today. Pray for America.

On January 7, 2021, Hiles posted to Facebook, in part, "The media tells you that we were an angry, violent mob that stormed the capital. Does this look like an angry violent mob to you?" Accompanying the caption was a selfie-style photograph of Hiles wearing goggles and a neck gaiter covering his mouth. Despite a blurry background, other individuals and the interior of the Great Rotunda are discernible in the photograph.

On January 10, 2021, the defendant posted an even lengthier narrative regarding the events of January 6, 2021. This post acknowledged the violence committed at the riot but again defended the breach of the U.S. Capitol:

I'm back from my Facebook suspension. I was suspended from Facebook for posting videos from the capitol on January 6th that directly contradict the media's narrative about what happened in Washington on January 6. I cannot attest to what anyone other than myself experienced that day. My experience was that I saw, I took part in no violence or vandalism, whatsoever. I fully support police and law enforcement and I would never bring harm to or threaten an officer. There were hundreds of thousands of people present that day, and as in any group, especially in a charged atmosphere, there are going to be bad actors. I did see people attacking police. I also saw police attacking people who should not have been attacked. I saw both protesters and police injured. I do not personally know those who were acting violently, but I hope that anyone who acted violently or destroyed property will be brought to justice. I am very concerned about what is happening in America and I attended on January 6th, because I believe there was significant fraud in the election and I hoped a large crowd would send a message that we will not allow our rights to be taken. I very simply would like to see the November elections investigated

and audited. I hoped the January 6th rally would have been a trigger to get congress to act on behalf of Americans who would like to see election integrity and what better way to have our voices heard than to have thousands of people unified in that message. I arrived to the Capitol Building early on, I was on the very front row and had a metal bike rack separating me from police. There were people throwing things at the police. There were people spraying mace and bear spray at the police. The police were using tear gas and pepper spray on the crowd and even though there were some bad people, the pepper spray and tear gas did not seem to have the effect of dispersing the crowd and it seemed to trigger the crowd. I perched myself on a concrete wall with a bunch of media watched as the situation escalated. The police began using more and stronger pepper spray and tear gas and it seemed to incite the people there. The police were not adequately equipped though. Most officers did not have goggles and masks to protect themselves from the pepper spray and tear gas that filled the air. And as the police used more and stronger deterrents, more of the officers succumbed to those deterrents and had to leave the area. Where I was, there was a sea of people, a barrier about 100 yards long, and about 100 officers to hold that barrier. Eventually the police removed the gates and fell back and collected themselves, further up the steps by the Capitol building by the terrace just outside the building. As the police fell back, I was shoved off the wall I was standing upon as the crowd surged. My foot was trampled on and now several days later, I am still in a lot of pain and think I may have a broken foot. Nonetheless, as the crowd surged forward up the steps towards the building, I was there, with a hurt foot, drenched in mace, pepper spray, tear gas, and bear spray. I couldnt stop coughing. My skin and eyes were burning. The crowd pushed me to the top of the steps. There was no going against the grain. Trying to oppose the crowd would have lead to me being trampled on the steps to the Capitol building. At the top of the steps, I found myself on the far side of the building again, very close to the front of the group with officers preventing the surge of people moving up the steps from going around the outside of the building. After being in the crowd for a few moments I made eye contact with the nearest officer to me and said "what now. I'm hurt and want to leave". The officer nodded and pointed to a door at the center of the building. There was a steady stream of people entering the building, so I made my way to that door. I approached the door and noticed that the door was not broken down. The door was opened. There were no officers guarding the door. When I entered the door, there was a flight of steps going up straight ahead of me and there was a flight of steps going down to my right. There was a short female officer standing at the top of the flight of steps telling people "dont go down those steps please, go up the stairs and officers will assist you". I walked up the steps and was under the rotunda of the Capitol building. I stood there with hundreds of people for a moment in amazement and watched as people were entering the area from every angle. It appeared to me as every entrance to the building had been opened. There were people everywhere. After spending a moment taking things in, I went back to my original goal of exiting the building to go home. While under the rotunda, I never saw anyone touch or vandalize anything and I distinctly heard several people saying "look but dont touch". There were media set up everywhere inside the building taking photos and videos. I exited the room and made my way into an

adjacent room. When I entered that room, there were only several officers in riot gear in that room. I walked into the room, put my hands up, and said to the cops "I'm trying to leave and I'm going this way" . One of the officers said "at ease soldier" and the other officers started laughing. I put my hands down and made my way into a room where hundreds of people were entering the building through a different opened door. This room was packed with people and I saw a wooden object on the floor that had been vandalized prior to my entering the room. A man kicked a door and numerous people and officers grabbed him and quickly told him "dont touch anything". People were celebrating and singing the national anthem, and God bless America inside there. I walked out of that room into a short little hallway full of closed and locked doors. It wasnt crowded so I stopped to try to get some water to clean the bear spray, mace, and pepper gas off my skin. An officer saw me limping and asked me if I was ok and if I needed medical attention. He offered me a cloth to wipe myself and water. I took a moment to clean up, and asked him how I could leave the building. He pointed and said "go over there". I went in the direction he told me to go, and saw other officers. I asked them the same question and they steered me in the right direction. I was walking past offices, and one office clearly above the door said "Office of Majority Leader Steny Hoyer" and a young woman officer was close by as the building seemed to open into a maze of hallways. I asked her "excuse me, I have been trying to find my way out of here, what is the closest exit?". She told me to make a left and go out the door. As I made my way down that hall, the mood was different. I saw officers arguing amongst themselves. I specifically remember hearing a male officer tell a female officer "I didnt sign up for this". I saw the door to exit, but as I looked down, I saw a trail of blood. Lots of it. As I made it to the door there was a metal detector, and a bunch of what appeared to be military in fatigues with assault rifles. There were men in suits that looked like fbi agents hurrying into the door. They came through the door, then I exited the the building through the door. Outside the building, there were police everywhere and a bunch of emergency vehicles. I followed the trail of blood in the direction of a bunch of police cars, fire trucks, and ambulances. A woman had been fatally shot, and they had just moments before carried her in front of me out to an ambulance. It was her blood on the ground. A crowd of people were yelling at police officers and a man said he was with the woman, and she had been shot for no reason. I later saw the video, and though the woman was unarmed, she clearly was not just passing through the halls of the building and using the building as an exit. Outside of the building, I wanted nothing more than to just go home. I walked away from the building but as I made my way away from the building, I saw news crews and media reporting that "Trump supporting terrorists stormed the capitol building". The building was not stormed. The doors were opened and people were allowed in by police. We were told to not touch anything and exit quickly. We were offered medical care. What I saw was not violent and going through the building was the fastest, easiest exit for me to end that day and go home. I told the "journalists" who were calling me a terrorist that a woman had been shot and killed and the scene of that was not far away and to go cover that. The media treated me like an annoyance- like I interrupted their broadcast. It was just a fitting end for what I saw as a terrible, sad day. I found my friends, jumped on the train, and went

home. Later that day I posted videos on Facebook as to what I saw. Those videos were not violent. They actually show me and others talking to the officers outside, offering them masks to help them with the tear gas. They show us peacefully going inside the building, nothing being destroyed, and officers assisting us. Those videos dont show what the media wants you to see. Facebook suspended me for posting those videos. The following day, I woke up sore. My foot hurt. My skin burned. I had trouble breathing. I saw that the woman who was shot died. I also saw an officer there died. That's terrible and tragic to me and it disgusts me that I was a part of that, whether I wanted to be there or not. I saw people saying that I was a terrorist. There were people turning me in to the FBI. I was contacted by Capitol police. The officer I spoke to, I told him this same thing as what I am reporting here. He told me that police are not after people like me. They are after people who broke the law. People who were being violent and threatening. People who destroyed, vandalized, and stole property. I was not there breaking the law. As with every interaction I've had with Capitol police on Wednesday and since Wednesday, he was respectful, professional, and thorough. We thanked each other for our time and moved along. I hope and pray they are able to find all the bad actors from that day and bring them to justice. In my opinion, those people ruined any message I was trying to send in being there that day. I have seen all sorts of things online since Wednesday. Much of what I have seen and read is not true. This is what happened. This is what I saw. Other people may have seen other things and I cannot attest to that. But right hand to God, everything I have written here is what I experienced.

*Contact with Then-U.S. Capitol Police Officer Michael Angelo Riley*

On January 7, 2021, a sworn U.S. Capitol police officer, Michael Angelo Riley, sent the defendant a private direct message on Facebook—the first message between the two, who had never met but shared an avid interest in fishing. The message stated as follows:

"Hey Jake, im a capitol police officer who agrees with your political stance. Take down the part about being in the building they are currently investigating and everyone who was in the building is going to be charged. Just looking out!"

Hiles responded to this message with a shorter version of the narratives posted on his public page and detailed above. He further stated, in part, "Investigate me however youd like and thank you for the heads up. . . . If what I did needs further investigation, I will gladly testify to this. There are some people who were violent. They attacked officers. They destroyed property. They should be

fully prosecuted."[2] In the course of an extended conversation that ensued between the two, Hiles also said, "I don't think I did anything wrong at all yesterday and I am very sorry things turned out the way that they did. I dont like the way that a few bad apples in a massive crowd are making the entire crowd be portrayed as violent terrorists," and "I think when the fbi gets to investigating, they will find that these terroristic acts were committed in false flag attacks by leftists."

The government's investigation revealed that these communications between Riley and the defendant had been deleted by Riley, but not by the defendant, from whose Facebook account they were recovered. The communications included further corrupt conduct by Riley, as detailed in part in the Indictment, ECF No. 1, in *United States v. Michael Angelo Riley*, 21-CR-628 (ABJ). Indeed, according to Hiles, and consistent with the evidence recovered in the government's investigation of Michael Riley, Hiles deleted no information in response to Riley's suggestion that he do so.

### Jacob Hiles' Charging and Arrest

On January 15, 2021, Jacob Hiles was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1)–(2) and 40 U.S.C. § 5104(e)(2)(G). On January 19, 2021, he surrendered to law enforcement and search warrants for his home, vehicle, and person were executed. A cell phone was seized and searched pursuant to the warrant.

### Jacob Hiles' Cooperation with the Government

At the time of his arrest, Hiles voluntarily agreed to an interview with the FBI. Hiles indicated that he had brought goggles in case there were other politically motivated individuals present who might attack rally-goers. He told investigators that he had entered the Capitol Building through an open door that did not appear to have been forced open. Hiles further stated that as soon

---

[2] This comment, as well as in his January 10, 2021, post above, suggests Hiles believed initially that then-Officer Riley reached out to him in an official capacity. The evidence in *United States v. Michael Angelo Riley,* 21-CR-628 (ABJ), has shown Hiles was mistaken.

as he entered the Capitol Building, he wanted to leave and requested directions to an exit from a police officer. Hiles described his path through the Capitol Building, emphasizing that he did not commit violence or destruction, but did not mention smoking an unidentified substance inside the building. He asserted that he supports law enforcement, participated in the riot at the U.S. Capitol for the purpose of protesting and did not expect it to become violent, and never wants to be part of event like January 6, 2021, again.

During the interview, Hiles also provided information about others present in Washington, D.C., on January 6, 2021, including informing law enforcement that he had entered the U.S. Capitol on January 6, 2021, with his Ohio-based cousin James Matthew Horning. Horning was ultimately indicted on one felony count of violating 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding), among other charges related to his entry into the Capitol Building. *See United States v. James Matthew Horning*, 21-CR-275 (ABJ).

Hiles further indicated that following the riot he had become friends with a Capitol police officer, although he did not at that time describe the content of then-Officer Riley's initial contact. Later, a search of Hiles' cell phone revealed a screenshot of the Facebook message detailed in the government's Sentencing Memorandum from Riley to Hiles on January 7, 2021. Upon discovery of the message, the government requested through counsel that Hiles participate in a debrief with prosecutors and federal agents. Through counsel, Hiles agreed to do so and appeared for the debrief (held virtually) within 24 hours, and with no promise of any benefit from or agreement of any kind with the government.[3] During the debrief, Hiles answered questions regarding the timing, nature,

---

[3] At the time of the debrief, a plea offer was pending Hiles' consideration. That plea offer was the same offer ultimately accepted by the defendant, except that it was wired to the plea offer in *United States v. James Matthew Horning*, 21-CR-155 (ABJ). After the debrief, the defendant requested that the plea offers be unwired. The government explicitly stated that it could make no promise to do so. Ultimately, the government unwired the two plea offers prior to the defendant's acceptance.

and channels of communication with Riley. The information provided was valuable in its own right, and assisted the government in scoping its investigation. Critically, significant further investigation by the government revealed that the defendant's assistance was truthful, substantially complete, and reliable. Later, Hiles voluntarily answered questions under oath regarding his contact with Riley, as well as his own participation in the breach of the U.S. Capitol on January 6, 2021. Riley was ultimately indicted by a grand jury on two counts of violating various provisions of 18 U.S.C. § 1512 (Obstruction of Justice). *See United States v. Michael Angelo Riley*, 21-CR-628 (ABJ).

### Charging Information and Plea Agreement

On February 24, 2021, Hiles was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 9, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, and Demonstrating Inside a Capitol Building. By plea agreement, Hiles agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d

1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.    Sentencing Recommendation**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In addition, while not formally applicable, the defendant's meaningful assistance to the government renders the factors detailed in U.S.S.G. §5K1.1(a) instructive: (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; (5) the timeliness of the defendant's assistance. As described below, the balance of the applicable sentencing factors weighs—uniquely among January 6th cases sentenced thus far— in favor of a probationary sentence.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol Building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

The defendant entered the Capitol Building after having been at the front of the surging crowd on the west side of the complex for a substantial period of time and witnessing violence and destruction, or tell-tale signs thereof, like the confrontations over the guard rails and officer's bloodied face described above. Moreover, while not engaging in acts of violence or destruction directly, Hiles maintained his presence directly against the police line and on at least two occasions verbally attempted to encourage police to abandon their duty and allow the rioters unfettered access to the Capitol Building. Similarly, his statements on social media in the days after the attack on the Capitol suggest that Hiles viewed his participation as defensible even as he condemned the actions of a few. On the other hand, Hiles was quick to condemn the violence and ultimately expressed remorse and regret in his consented to interview with the FBI on January 19, 2021. His time in the Capitol Building was relatively short, if marked by incongruous revelry near the Senate Wing Door, and did not include destructive conduct, entry into sensitive areas, or confrontations with law enforcement. And Hiles did not seek to evade prosecution by destroying evidence or providing materially false or misleading information to law enforcement.

The nature and the circumstances of the offense support a sentence of incarceration. However, for misdemeanor defendants like Hiles, who engaged in conduct on January 6, 2021, but who have demonstrated remorse and cooperation with the government, including by providing information of significant value to other prosecutions, a sentence short of incarceration remains possible.

### B.  The History and Characteristics of the Defendant

The Final Presentence Investigation Report ("Final PSR"), ECF No. 32, sets forth Jacob Hiles' history and characteristics as relevant to the instant sentencing. According to the PSR, Hiles acknowledged protesting inside of the Capitol and stated, "I take full responsibility," noting his

cooperation with the government post-arrest. Final PSR, ECF No. 32, ¶ 22. Hiles also asserted threats to himself and his daughter resulting from his participation in the attack on the Capitol. *Id.* ¶ 23. Hiles is the sole caregiver for his eighth-grade aged daughter and would ask that his brother care for her in the event a period of incarceration is imposed in this case. *Id.* ¶ 44–45.

Since January 6, 2021, Hiles has remained employed as the sole proprietor of a sport fishing enterprise in Virginia Beach, Virginia, which he operates pursuant to a fishing license issued by the U.S. Coast Guard National Maritime Center. *Id.* ¶ 56–58. He asserts his income has dropped significantly since January and that he has supplemented it with work as a fisherman for a Virginia Beach restaurant. *Id.* ¶¶ 23, 58.

According to the Final PSR, Hiles' criminal history consists of misdemeanor convictions for Trespass/Jetty in 1998 and Driving Under the Influence in 2004. *Id.* ¶ 27–28. The Final PSR also notes numerous infractions between 1998 and 2018, primarily traffic or fishing related. *Id.* ¶ 30–32.It also notes a domestic violence case in which Hiles admitted to slamming an individual's head onto the dashboard of a car after she allegedly punched him in the mouth. She had reported to law enforcement that the defendant had punched her in the mouth. *Id.* ¶ 33. Both parties had visible injuries, and the matter was ultimately dismissed. *Id.*  The Final PSR also discusses the defendant's pretrial compliance, noting that he has failed to check in once a week as required on five occasions since January 22, 2021. *Id.* ¶ 9.  However, Pretrial Services has not requested judicial action based on these failures, which have been sporadic. *See* Pretrial Services Reports, ECF Nos. 8, 12, 19, 21.[4]

---

[4] The Final PSR also reflects that the defendant's conditions include not possessing firearms. Final PSR ¶ 9. However, the conditions in fact require that he not possess *illegal* firearms. The defendant made the Court aware of his possession of firearms at the initial appearance in this matter.

As someone possessing a U.S. Coast Guard-issued professional license and the primary caregiver to a minor child, Hiles should have been deterred from participating in the dangerous and volatile events of January 6, 2021. Hiles' criminal history further suggests a tendency toward dangerous—if less than felonious—behavior that concerns the government. However, the government gives great weight to Hiles' acceptance of responsibility, especially when coupled with his meaningful cooperation with the government in response to two felony prosecutions, as discussed further in the following section. Accordingly, the government believes his history and characteristics favor a probationary sentence.

### C.  The Defendant's Assistance to the Government

The defendant's level of cooperation with law enforcement is singular among the defendants sentenced thus far for their participation in the breach at the U.S. Capitol on January 6, 2021. In the first place, the defendant's response to then-U.S. Capitol Police Officer Michael Angelo Riley's Facebook message telling him to take down Facebook records of Hiles' wrongdoing was *not* to do so. Nor did Hiles delete his communications with Riley. Consequently, the government was able to recover those communications in the course of its investigation.[5]

The defendant also provided meaningful affirmative assistance to the government. At the time of his arrest, the defendant agreed to an interview with law enforcement, providing information crucial to the identification of defendant James Matthew Horning. Significantly, the defendant's cooperation has continued since his arrest and charging. As noted above, Hiles made himself available to debrief on 24 hours' notice when requested and answered questions relating to Riley that enabled the government to focus its investigation. Also at the government's request,

---

[5] Hiles has indicated that Facebook removed his account in either late January or early February 2021.

Hiles voluntarily traveled out of state and answered questions under oath. And other evidence gathered in the course of the government's investigation demonstrates that the defendant's assistance has been fulsome and reliable.

The defendant's assistance in the two felony prosecutions described above is significant. Nearly eleven months after January 6, 2021, despite charging more than 650 rioters thus far, the government's efforts to apprehend those who participated in the attack on the U.S. Capitol are ongoing. The defendant's identification of James Matthew Horning—his cousin—to law enforcement saved precious public resources. The significance of Hiles' assistance is even greater with respect to the investigation and prosecution of Michael Angelo Riley. That assistance has involved providing information on multiple occasions, and in various and inconvenient forums— and acknowledging the defendant's own conduct in addition to that of Riley. And it has been rendered without any offer of a cooperation agreement. Absent Hiles' forthrightness, both in preserving records of communications by him and Riley, and in addressing sensitive inquiries from law enforcement, prosecution of Riley—a now-former U.S. Capitol Police Officer—may not have been possible.

The government understands that individuals who provide meaningful assistance to law enforcement risk backlash of all kinds. The defendant's decision to do so weighs heavily in favor of a probationary sentence in this case.

### D. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[6] This factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### E.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/ sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted in the above discussion of Hiles' history and characteristics, this defendant should have been deterred by his responsibilities as a parent and a business licensee from ever participating in the disturbing, lawless events of January 6, 2021. Also as noted above, Hiles' previous contacts with the justice system, albeit for non-felony conduct, suggest a pattern of reckless behavior in which his participation in the riot on January 6, 2021, could be seen as merely an escalation rather than an aberration. In this regard, the government's concerns are heightened by his repeated suggestions in the immediate aftermath of January 6, 2021, that his presence did

not contribute to the violence and destruction that occurred that day. These concerns are mitigated by Hiles' immediate and continued assistance to law enforcement. A clear need for specific deterrence remains, warranting a sentence of substantial length.

### F.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. *See* Attachment A.[7] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[8] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United*

---

[7] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Picketing, and Demonstrating Inside a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed in the attached table participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on

social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

As review of Attachment A demonstrates, no previously sentenced case contains the specific blend of aggravating and mitigating factors present here Most notably, no previously sentenced defendant has provided assistance of the degree provided by the defendant in this case. Indeed, had such assistance not been provided, the government may have recommended a period of incarceration for this defendant. In other words, this case is unique among those sentenced thus far and not susceptible to direct comparison to any other case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the sentencing factors described above. As explained herein, some of those factors support a sentence of incarceration. Indeed, without the defendant's significant, useful assistance to the government with respect to two felony prosecutions, the factors would require the government to recommend a sentence involving incarceration. Yet, upon consideration of the defendant's exceptional cooperation with the government, the scale tips in favor of probation. Accordingly, the government recommends that this Court sentence Jacob Hiles to three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility and uniquely significant cooperation with the government.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     MARY L. DOHRMANN
NY Bar No. 5443874

Assistant United States Attorney
Federal Major Crimes Section
U.S. Attorney's Office
555 4th Street, N.W., Room 4826
Washington, D.C.  20530
Office: 202-252-7035
Mary.Dohrmann@usdoj.gov